ELIZABETH WYCKOFF, ADMINISTRATRIX, DEFENDANT IN ERROR, v. FOSTER F. BIRCH, PLAINTIFF IN ERROR.

Submitted July 11, 1908—Decided November 16, 1908.

1. Plaintiff's intestate was killed by the fall of a platform composed of planks laid loose across the structural iron bracing inside of a stand-pipe that was in course of erection by the defendant's servants. The fall of the platform was due to the tearing asunder of one of these iron braces in the attempt to force a lug attached to its distal end into contact with the inner wall of the stand-pipe, where it was to be permanently riveted. The occasion that led to this attempt and to the accident that ensued arose from the faulty workmanship of those engaged in erecting the stand-pipe, which permitted it to become elliptical in form, and from the misuse of the appliances that had been furnished by the master to strengthen the stand-pipe and secure its cylindrical shape. *Held*, that a master who furnishes his servants with a proper scheme of construction, proper materials and proper appliances is not liable to them for the results of an accident due solely to improper workmanship and to a misuse of the appliances he has furnished.

2. Negligence in its essence is always concrete, hence its proof must always rest upon testimony that tends to the establishment of concrete acts, either of omission or of commission; there is no such thing as negligence at large.

On error to the Supreme Court.

For the plaintiff in error, *J. Lefferts Conard, George S. Hobart* and *Gilbert Collins.*

For the defendant in error, *Vreeland, King, Wilson & Lindabury.*

The opinion of the court was delivered by

GARRISON, J. This writ of error brings up a judgment recovered by the defendant in error as plaintiff in the action brought in the court below to recover damages for the death of Leroy Wyckoff, which resulted from injuries received while working on a stand-pipe that was being erected by the defendant at Mount Hope, Morris county. To a proper comprehension of the case in its legal aspects an understanding of the exact nature of the work in which the plaintiff with other servants of the defendant was engaged at the time of the accident is essential. The stand-pipe in question, which was when completed to be a cylindrical column of sheet iron eighty feet in height by twenty feet in diameter, was constructed of metal sheets riveted together in a series of circular courses and superimposed on each other. Each sheet was three-eighths of an inch in thickness, eight feet in length and five feet in height, so that allowing for overlapping a course or segment of the column consisted of eight of these sheets which were riveted together before being brought to the stand-pipe and hoisted into position. After a course thus constructed had been hoisted into position it was secured to the one next below it by rivets, its circular shape being restored and preserved in part in this way, but chiefly by a series of internal structural braces called "reaches" or "angle irons" that radiated like the spokes of a wheel from a small central iron pipe surmounted by a sort of iron hub called "a spider" which had eight short arms, to each of which an angle iron was bolted so that it extended from the arm of the spider to the inner surface of the sheet iron cylinder where it was bolted into the under side of a horizontally projecting foot of a right angled lug, whose perpendicular part was held by two bolts to the inside of the cylinder or shell. These angle irons, being of uniform length and situated equi-distant from each other in the circumference of the shell, insured, when properly installed, its cylindrical

form. In each section of the stand-pipe, that is, in every five feet of the ascending column, one of these permanent structural brace-works was constructed. When one course had been thus completed the iron pipe in the centre was raised five feet to correspond to the height of the next course; another spider was then placed on this new section of pipe, new lugs were bolted to the inner side of the new section of cylinder, near its top, to the horizontal feet of whose lugs were bolted new angle irons that were also bolted to the corresponding arms of the spider, and so on as the work progressed; the work on each course being done from a platform of planks that rested on the angle irons that thus formed part of the construction of the course next below it. The structural bracing thus constructed inside of each course, which served the permanent purpose of strengthening the stand-pipe and securing its circular form, performed also the temporary use of a scaffolding to support the platform from which, after the first course, the work of construction had to be carried on. This iron scaffolding, if it may be so called, was therefore a permanent structure that supported the temporary platform in question. This platform consisted merely of two-inch spruce planks, laid loose upon the angle irons, not fastened down, but movable as the exigencies of the work might require. There being eight of these angle irons in a circumference of sixty feet it is evident that a piece of planking twelve feet long would rest upon three or upon four angle irons, according to the distance between such plank and the ends of the angle irons. The length of the planks actually used is not given in the testimony otherwise than that they were of various lengths, but no complaint is made that they were not of sufficient length or that they were otherwise of an improper character; the complaint is not that proper material for making the platform was not provided, but that the scaffolding, that is, the permanent iron structure, gave way.

The stage of the work at which this accident occurred and the manner of its causation as described by the plaintiff's witnesses was as follows: In order to make the pipe water tight

the two ‘bolts that had during the progress of the work on a given course held the perpendicular part of each lug to the inner aspect of the last section of the shell were taken out and replaced by metallic pins which were firmly riveted. This was not done until the work on the newer section was otherwise completed, for the reason probably that the leverage on the angle irons caused by working upon the platform after the lugs that held the scaffolding had been riveted would loose the rivets and render the pipe at such points liable to leakage. However that may be, the fact is that the replacing of the bolts with rivets was done just before transferring the planking from the old set of angle irons to the new set just above them. In this process of replacing the bolts with rivets there would be times when the lower end of the perpendicular part of the lug did not exactly parallel the inner surface of the shell, or where the hole in the lug and the corresponding one in the shell did not exactly align, so that the lug must either be forced into contact with the shell or moved laterally until an alignment of the holes was effected. It was at this stage of the work, and while engaged in this part of it, that the plaintiff's intestate met with the accident that caused his death. One of the lugs to be thus riveted was not in contact with the side of the shell, and ·Wyckoff and a fellow workman named Cole were engaged in forcing the bottom of this lug back against the shell so that it might be riveted. In doing this Wyckoff held a small hammer called "a set" against the lug, and this "set" was struck by a six or eight-pound hammer handled by Cole. This process had been going on for a minute or so, Wyckoff kneeling on the planking that rested on the angle iron that was attached by a single bolt to the horizontal foot of the lug that was being forced back when, upon a blow from Cole's hammer, the bolt that thus held the angle iron to the foot of the lug that was being struck gave way by shearing in two, as if cut or torn off, and the end of the angle iron that had been held to the lug by this bolt being thus released dropped and with it fell the two pieces of the planking that had rested on this particular "reach." ·Wyckoff, who had

been kneeling at this point of the platform, fell with the two planks, and in this way received the injuries of which he afterward died.

I have stated thus circumstantially the character of the work on which the plaintiff's intestate was engaged and the nature of the accident that led to his death, as each of these matters is described by the plaintiff's witnesses, in order that the state of the testimony as it stood when the motion to non-suit was made may be properly understood and applied to the question of the defendant's negligence. At that period of the trial, in addition to the foregoing particulars, the plaint-iff had, by numerous witnesses, shown that as the stand-pipe went up section by section it gradually began to depart from its cylindrical form and to assume a more or less elliptical shape, so that the angle irons came to be somewhat too long for the shorter axis of the ellipse where they had to be bent, and somewhat too short for the longer axis where they had to be pieced or otherwise adapted. The existence of this state of affairs, that is, the fact that the stand-pipe was elliptical in form and the fact that in one axis of this ellipse the angle irons were too short to reach from the "spider" to the circumference of the shell, constituted the two grounds upon which negligence was sought to be ascribed to the de-fendant, both by the plaintiff's declaration in the court below and by the argument made in her behalf in this court. In view, however, of what has already been said it is perfectly clear that while the first of these conditions was the cause of the second, and while both together created the occasion that led to the accident by which Wyckoff lost his life, there was nothing in this state of affairs that tended in the slightest degree to demonstrate the negligence of the defendant either in permitting the stand-pipe to get out of shape or in failing to furnish angle irons of a proper length. On the contrary, the testimony of the plaintiff's own witnesses showed con-clusively faulty workmanship by the defendant's servants and a faulty use by them of the material and appliances that had been furnished to them by the defendant, which, if prop-erly used, would have entirely obviated both of the condi-

tions that led to the occasion out of which the accident arose. It is nowhere disputed that the stand-pipe, if properly run up, would have been cylindrical in form, or that the angle irons that had been furnished by the master were for the express purpose of securing and maintaining this cylindrical form of the pipe or that if properly used they would not have done so. It was only, therefore, by faulty workmanship in permitting the sheet iron shell to assume an elliptical shape and by then adapting the angle irons to this improper shape, instead of preserving the cylindrical form of the pipe by their proper use, that the condition arose under which the application of great force was attempted in order to bring the lug at the end of an angle iron into juxtaposition with the pipe, with the result of tearing off the bolt that held the angle iron to the lug and thus permitting the end of the angle iron to fall. The contention that the negligence of the master was in anywise established by the fact that the courses, when hoisted into position, were not perfectly cylindrical, is entirely without force; that a roll of sheet iron sixty feet in circumference and only three-eighths of an inch in thickness should preserve an exactly cylindrical form during transportation and while being hoisted into place is contrary to the plainest physical laws. Moreover, as has already been pointed out, the inner structural bracing afforded by the "spider" and angle irons was provided for the express purpose, first of restoring and afterward of preserving the cylindrical form of the several courses of the stand-pipe when in place. Similarly, the testimony so much dwelt upon in the argument that some of the angle irons were too short or "were punched too short" loses all significance or bearing upon the master's negligence in view of the established fact (as far as the plaintiff's testimony goes) that the condition in question resulted solely from faulty construction and not from original design or from inadequate materials or appliances. The fact that the angle irons whose proper use was thus disregarded by the defendant's workmen constituted also the supports of the platform on which these very workmen stood, so far from suggesting the negligence of the master in respect to any duty

owing to his servants tended rather to aggravate the negligence of their workmanship in which the master had no part. The workmen knew what the master did not know, namely, the use, or rather the misuse, they were making of the angle irons; they saw what he did not see, namely, that such misuse had led to conditions where much greater force was required than would have been necessary if the proper function of the angle irons had been observed. Whether this degree of force, if applied to a given lug would put more strain on the single bolt that held it to the angle iron than it could bear, was a question, therefore, that arose from conditions known to the workmen and of their own creation, and not known to the master or of his contrivance. Under these circumstances, when the nature of the work and the manner in which it ought to have been done are considered, and the manner in which it was done is understood, it is impossible to ascribe to the defendant from the foregoing conditions any act of negligence that either directly or indirectly contributed to cause the accident by which the plaintiff's intestate was killed.. The materials and appliances furnished by the master were proper and adequate to the work to be performed. The plan of construction intended by the master and almost necessitated by the nature of the appliances furnished by him was free from either obvious or latent dangers; the iron scaffolding that was provided automatically in the progress of the work, and which was entirely safe as long as the plan of construction was adhered to became unsafe only when and to the extent that such plan was departed from. The plaintiff's own testimony showed that the plan was departed from, not by the master, but in the course of the work, and that the appliances were not properly applied to the purposes for which they had been provided, and further that from these acts of faulty workmanship it resulted not that the scaffolding became unsafe, but that it was literally torn asunder by the application of a force, the necessity for which arose entirely from such faulty workmanship. Aside from the elliptical shape thus assumed by the stand-pipe in the course of construction, and the consequent lack of reach of

some of the angle irons, no concrete act, either of omission or of commission, constituting negligence, is laid by the testimony at the door of the master. If he was negligent in some other regard that caused the death of plaintiff's intestate it must have been either with respect to some act done by him or some duty that he omitted to perform, but as to any such act or as to any such duty the testimony is not only silent but is conclusively to the contrary. Arguments based upon isolated circumstances or detached statements of witnesses or upon general allegations of negligence go for nothing when unsupported by testimony as to concrete facts. In its essence negligence is always concrete. "There is," as was said upon another occasion, "no such thing as negligence at large." *Bien* v. *Unger,* 35 *Vroom* 596.

The rule of law applicable to the present case is that a master who furnishes to his servants a proper scheme of construction, proper materials and proper appliances, is not liable to them for the results of an accident occasioned by and solely due to improper workmanship and a misuse of the appliances that the master has thus furnished. For this proposition no citation of authority is deemed necessary.

The result in our opinion, therefore, is that when plaintiff rested without having adduced testimony as to any fact from which the negligence of the defendant either as the proximate or the remote cause of the death of the plaintiff's intestate could legitimately have been found by the jury, the motion for a nonsuit should have prevailed. It may be added that the testimony afterward adduced by the defendant which contradicted much of the plaintiff's case added nothing to it by way of supplying its deficiencies.

Nothing has been said regarding the contributory negligence of the plaintiff's intestate, the case having been considered and disposed of upon a broader ground; and in what has been said the fellow-servant rule has not been invoked or referred to for the reason that this question was not raised in the trial court, either upon the motion to nonsuit or at the close of the entire case. The only question that has been

considered is that of the negligence of the defendant.
Whether or not this question was properly raised by the
motion to nonsuit is a matter that at first gave us some
hesitation. The language of counsel in making this motion
was as follows:

"Mr. Conard—I desire to move on behalf of the defendant
for a nonsuit (citing certain cases). There is absolutely
nothing to show in this case other than that the plaintiff,
who was the servant of the defendant, caused whatever dan-
gerous circumstances there were. Whatever occurred to the
plaintiff in this case occurred through his own negligence in
the progress of the work on which they were occupied."

This language was certainly not well adapted to suggest
that the motion was based upon the ground that the negli-
gence of the defendant had not been established, so that if the
bill of exceptions had left it in doubt whether the mind of
the trial court had been directed to this point we would be
inclined to hold that the judicial ruling could not, in this
respect, be made the basis of a reversal. The bill of excep-
tions, however, shows beyond all question that this point was
present in the mind of the trial judge, for his response to
counsel's motion was:

"The Court—The only question for the court in a case of
this kind is as to whether or not there is any evidence from
which the jury, under instructions from the court, might
infer and conclude as to the negligence of the defendant. If
there is any such evidence it is not the duty of the court to
pass upon the quality of that evidence or its conclusiveness.
It is entirely for the jury. There is some evidence which,
under the pleadings, it is competent for the jury to pass upon
as to the negligence of the defendant, and that being so the
question is entirely for the jury."

The question of the defendant's negligence, which was thus
raised at the trial, having been fully argued by counsel of
either party in this court, is therefore properly before us on
this writ of error. For the reasons already given the judg-
ment of the Supreme Court must be reversed.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, SWAYZE, REED, TRENCHARD, PARKER, BERGEN, VOORHEES, BOGERT, VREDENBURGH, VROOM, GREEN, GRAY, DILL, J.J. 15.